HENRY GASSETT & CO. APPELLANTS, VS. WILSON & BROWN, AP-
PELLEES.

<div style="float:right">3  235<br>49  267</div>

B., a member of the mercantile firm of B. & B., which had failed, made an arrangement with the creditors of said firm, by which he procured a promise of indulgence, upon an agreement on the part of the firm to pay within a certain specified time fifty cents on the dollar of their debts. He then formed a new connection with one N., upon the capital of N., and such credits as they could jointly obtain. This new concern, after having been in business for a short time, was compelled to sell out at considerable loss. B. then formed a partnership with one W. One of the creditors of the old concern of B. & B., having obtained a judgment against them, proceeded to levy execution upon the interest of B. in the concern of W. & B. *While the suit of the creditor was pending*, for the purpose of preventing any of the creditors of the concern of B. & B. from obtaining any advantage over the others by a sale of his aforesaid interest, declaring, at the same time, that one of the causes impelling him to the act was the pending of said suit—and for the avowed purpose, also, of paying N. what he owed him, and other creditors of the firm of B. & N., B. withdrew his capital in the concern of W. & B., and applied it to the payment of the debts due to N. and others, contracted since the failure of B. & B. The right to withdraw his capital at any time he might desire to close the concern, was stipulated and agreed upon in the articles between W. & B. Held—That such withdrawal was not fraudulent, having been made for the purpose of paying just and *bona fide* debts.

Appeal from a decree made by Judge BALTZELL, at a Circuit Court for the County of Leon, on the thirtieth day of October, 1849. The material parts of the bill, answers, exhibits, report of the master and proofs in the cause, are set out in the opinion pronounced by the Court—from which the following statement of the case is detached and inserted here :

" This is a suit in Chancery brought up by appeal from a decree of the Circuit Court of Leon County. The bill charges, that the complainants, on the 20th day of May, 1846, the Spring Term of Leon Circuit Court, obtained a judgment against the firm of M. C. & J. W. Brown, of which the defendant, Joseph W. Brown, was a partner, and joint defendant, for the sum of two thousand six hundred and ninety four dollars and fifty cents. That on the 26th June last, a writ of *fieri facias* was issued upon said judgment and placed in the hands of

the Sheriff of Leon County, to be levied according to law, upon the goods and chattels, &c., of M. C. & J. W. Brown. That defendants, Brown, had and have no property in their own name and possession, known to complainants, but are in failing circumstances, and not doing business in their own names. But it being notorious that defendant, Joseph W. Brown, had entered into partnership with defendant, Wilson, in a large and valuable store in the city of Tallahassee—that said Wilson & Brown had held themselves openly as joint partners, by public advertisement and notice, the Sheriff was induced to levy said writ of execution upon the undivided share and interest of the said defendant, J. W. Brown, in the said store, and did on the 31st day of July, 1846, actually levy said writ upon the whole undivided share and interest of said defendant, J. W. Brown, in and to the store and commercial concern standing and being in the name of Wilson & Brown, in the city of Tallahassee, and after due advertisement and notice according to law, did on Monday the 5th day of October, instant, sell and dispose of the same by public auction to the highest bidder, and that they the said complainants, to save themselves from loss, did bid for said undivided claim and interest of debtor, J. W. Brown, and being the highest bidders became and were proclaimed the purchasers of the same for the sum of one hundred dollars. The bill also prays that an account may be taken of the interest so purchased, and that complainants may have a decree therefor, &c.

The answers of the defendants admit the partnership of Wilson & Brown, and the articles of partnership are annexed to the bill, as exhibit A, by which it appears that it was entered into on the 12th day of January, 1844. That Wilson put in as capital stock $1510 12-100 in merchandize, $1500 of which was included in a mortgage given to Messrs. Wilson & Herr, of the city of Baltimore, on the 13th November, 1843, for the purposes therein mentioned; and that Brown put in 1321 87-100 in merchandize, and it was stipulated " that the concern should be dissolved and each of the parties draw his proportion of the capital thereof, whenever either of the parties might wish to close the concern." Exhibit B is a memorandum of an agreement between the parties made on the 11th day of April, 1846, which recites that whereas Joseph W. Brown hath drawn on Wilson & Brown (the parties to this agreement) for sums of money

sufficient to cover his interest in said concern, to make payment of debts of the said Brown disconnected with the business of Wilson & Brown, and the said Joseph W. Brown is no longer entitled, under the existing articles of copartnership between himself and Wilson, to share the profits of the concern of Wilson & Brown. And whereas the drafts of the said Brown have been accepted by Wilson & Brown, who are still liable for the same when they shall fall due respectively: and whereas the said David C. Wilson hath assented to the acceptance of the drafts aforesaid, and is willing that the said Joseph W. Brown shall continue a member of said firm of Wilson & Brown and receive a share of the profits of the concern, notwithstanding the drafts aforesaid, for twelve months from the date hereof, and until the drafts shall be fully paid, and provided the said Joseph W. Brown continues to give his personal attention to the business of said firm, and continues to be jointly liable with said Wilson for any debts, contracts and engagements of the firm of Wilson & Brown, connected with their regular mercantile business. Now, therefore, it is mutually agreed, &c., (here follows an agreement in accordance with the foregoing recital.)

The answers of the defendants admit the recovery of the judgment, the execution, levy, sale of the property, and the purchase of it as stated in the bill, but allege that the sale was illegal, and that the complainants consequently acquire no title. And Wilson, in his answer, says that Brown was a partner of his on the 26th of June last, and up to the time of the sale—that the partnership continued under the articles contained in exhibit A, until the 11th of April last, when the said Joseph W. Brown, having withdrawn his capital under the provisions of the original articles, new articles were entered into extending the copartnership to a period of one year from that date, on the terms and conditions, specified in the articles contained in exhibit B. That on the 26th June last, said defendant, J. W. Brown, was indebted to the firm of Wilson & Brown in the sum of $240 70 according to the statement of his account with said firm, made up to that time, and marked exhibit C. That on the 31st day of July last, the defendant, Brown, was indebted to Wilson & Brown, in the sum of $1081 4-100, as per statement marked D, both of which are averred to be correct—that in addition, he is properly chargeable with his proportion (one half) of the loss and discount on certain

counterfeit and uncurrent funds, on hand at the time of said levy. Also the loss and expenses attending the disposal of the stock on hand at the time of the levy—which stock, on the 18th of April last, amounted, as per inventory, to $6,396 73-100, but which amount was diminished by sales from 13th of April to the 31st day of July last, to $5,000, on which Wilson claims a discount, on account of the goods being unsaleable, of not less than twenty per cent.

The defendant, Brown, in his answer, after admitting the facts charged as admitted in Wilson's answer, further says, that the motive and end of this defendant in altering the terms of the partnership, were no other than a disposition to provide for certain demands against that defendant, which he deemed it equitable and proper for him to provide for to the exclusion, if necessary, of the old liabilities of M. C. & J. W. Brown. That to provide for debts contracted since the debts due by M. C. & J. W. Brown, as hereinafter mentioned, he was advised that it was not only legal, but equitable and just under the circumstances. That M. C. & J. W. Brown were in business in 1842 and in 1843, at Cedar Keys and Port Leon, and in the gale of October, 1842, at Cedar Keys, and in the gale of 1843, at Port Leon, lost not only their stocks of merchandize, but also their books of accounts, and evidences of demands, except one day book, so much obliterated as to be of little or no service. That their misfortunes caused the failure of M. C. & J. W. Brown, and left them wholly unable to pay their outstanding obligations, of which the note of complainant on which said judgment is rendered, was one. That in the fall of 1846, the creditors of M. C. & J. W. Brown, in view of their misfortunes, which no human power could avert, agreed to relinquish fifty per cent. of their claims. That upon the faith of the assurances of liberality on the part of his creditors, and convinced that they appreciated his misfortunes, he and one B. Nason, Jr., united in business upon the capital of B. Nason, of small amount, and upon such credits as they could obtain under the circumstances.

Brown & Nason purchased a stock of goods and offered them for sale in Newport, Florida, but as their fall purchases did not reach Florida in time for the business of the winter, they were compelled to sell out at a loss in the month of February, 1845. That in the fall of 1846, this defendant bought goods for Wilson & Brown, having previously united in business with said Wilson. That on- the

13th day of April, 1846, he was indebted on account of business transactions since the agreement with his creditors as aforesaid, to Taylor & Rich, of New York, to B. Nason, his former partner, and to J. C. Hanson, for whose benefit he drew on the firm of Wilson & Brown, for $750, $800, $1000, respectively, as stated in the account current filed with the answer of David C. Wilson. This defendant further says, that on account of said agreement with his old creditors, and their said assurances, which have been kept sacredly by all save the complainants, he was enabled to procure credit, and to form and continue his business connections as aforesaid.

The testimony in the case is contained in the report of the master, to which no exceptions were taken, and consists principally of the statements of these defendants, both of whom were examined by him.

David C. Wilson, one of these defendants, stated that the drafts of J. W. Brown, accepted by Wilson & Brown, as stated in No. 1 of exhibit C, were unpaid at the time of the levy of complainant's execution, on the 31st day of July, 1846, and remain yet unpaid.— That the first stated of these drafts was held last fall by Taylor & Rich of New York, who demanded payment of witness. That these drafts, when accepted by the firm, were delivered to J. W. Brown, and witness cannot, from his own knowledge, say how they were afterwards disposed of, or who held them at the time of the levy, or now holds them. That the above acceptances were made, in order to enable J. W. Brown to withdraw his share of the capital and profits of the firm of Wilson & Brown, he declaring it to be his intention thereby to prevent any one of his former creditors from getting an advantage over others, by means of any execution or suit, and sale of his interest as above stated; and the suit of complainants then pending, and about to be carried into a judgment, was one of the claims, as witness understood, moving said Brown to the above course. The existence of this suit was known to witness at the time.

Brown, the other defendant, in his testimony taken before the master, states that the consideration of the acceptance given by Wilson & Brown, in favor of B. Nason, Jr., was his, witness', indebtedness to said Nason, on closing the affairs of Brown & Nason, (which was done at great loss,) for the money and capital brought into said firm by

said Nason, beyond or exceeding any capital furnished by witness, and that the amount of such acceptance, viz : eight hundred dollars, was in fact much short of witness' actual debt to said Nason, the full amount of his debt being at that time near fifteen hundred dollars. Witness further testifies that Taylor & Rich of New York, to whom the acceptance of Wilson & Brown for $750 was given, were the New York agents for the house of Brown & Nason, through whom their payments and settlements in New York were almost exclusively made, said agents being often in advance for witness' firm by acceptance or otherwise. That at the time the above draft on Wilson & Brown was made and accepted in favor of Taylor & Rich, they (T. & R.) agreed to take up and pay, and did actually, in consideration thereof, take up a note given by Brown & Nason to Perkins & Hopkins of New York, in the regular course of business, for the purchase of goods—which note, with interest, then amounted, as well as witness could estimate, to the sum of seven hundred and fifty dollars. Witness also states that the third acceptance, set forth in his answer as made by Wilson & Brown, and held by J. C. Hanson, for one thousand dollars, was given in consideration of witness being indebted to said Hanson, on striking a balance of accounts between them for various matters arising in the regular course of trade, commencing chiefly in the month of February, 1845. That said Hanson furnished to witness various amounts in money, drafts on New York, &c., to enable witness to settle up with the creditors of Brown & Nason, and other debts due by witness. There was some other proof, but it does not materially vary the aspect of the case.

The master in his reports says he proceeded to examine the books and accounts of Wilson & Brown, more particularly to ascertain the basis upon which the general statement of profit and loss, and balance sheet of 13th April, 1846, was made out, and to look carefully into the account of defendant, Brown, as these are stated in exhibit C, to defendant, Wilson's answer. These books (he says) appear to be all fairly kept and the entries regularly made, and in the order of the several transactions recorded, besides being sustained by the oaths unimpeached of both the defendants. The master says he could discover no item on which rested any suspicion of fraud or unfairness. He believes, and so reports, that every item charged in the account

of J. W. Brown, (see exhibit C,) constitutes a fair and *bona fide* charge against him, in the regular course of business. The drafts, which constitute the three first charges in said account, (the drafts for $750, $800 and $1,000, above mentioned,) were passed over to three creditors, and intended as part payment of debts fairly and justly due by said Brown, as is fully stated in his answer, and again more fully explained in his testimony taken in the course of this reference. That account shows a balance due by the defendant, J. W. Brown, to the firm of Wilson & Brown, on the 25th July, 1846, of $240 74-100. But inasmuch (says the master in his report) as it is a question reserved, as exclusively belonging to the Court to determine, whether a debtor has a right to apply his property or assets to the payment of some creditors in preference to others, as appears to have been done by defendant, Brown, in the present instance ; and because the Court may decide against his right to do so, and decree that his interest in the firm of Wilson & Brown has not been rightfully transferred, charged and balanced by these acceptances, but remained legally and equitably subject to complainant's judgment, &c.— the master restated the accounts, and made J. W. Brown debtor to the firm of Wilson & Brown for over drafts on 30th July, 1846, $1,524 50-100.

No exceptions were taken to the report of the master, and it, therefore, stands confirmed; according to Rule 83. See Rules of Practice for the Courts of Equity, page 61."

*Randall,* for appellants :

This cause comes up by appeal from a final decree rendered in the Circuit Court for Leon County, on the 30th October, 1849, dismissing bill of appellants, the complainants below, with costs, &c. The case was submitted below, on bill, answers, general replication, and report of the Master in Chancery, which contains all the proofs in the cause.

If the proofs do not present a case favorable to defendants, it is the fault of their cause, since all the testimony and evidence furnished, (with the exception of the not very material testimony of one witness —Rust,) are taken from their own answers to the bill, from their books and accounts filed, and from their examinations taken under oath before the master.

31

To the mere statement of the accounts and the facts reported by the master, we take no exception, nor to any matter he professed to decide, though we do not acquiesce in all the inferences he drew on grounds and facts not reported by him.

On the 31st July, 1846, complainants having a valid subsisting judgment for the amount of $2694 50, against defendant, Brown, one of the partners of the firm of Wilson & Brown, and an execution then in the hands of the Sheriff, for the satisfaction of which no separate property of said Brown could be found—they caused their execution to be levied on the share and interest of said Brown in the partnership concern. That share and interest was sold in due form of law by the Sheriff, and complainants became the highest bidder and purchaser for the sum of $100—defendant, Wilson, (as he admits,) bidding against them to within a trifle of that last bid. To have the benefit of that purchase, this bill for discovery and relief was filed. The course is in entire conformity with law, and has not been excepted to formally in any part of the proceeding.

And now we contend, that the drawing of these three drafts on the firm, and their acceptance by the partner, Wilson, in the name of the firm, was a direct, palpable fraud in law, so far as regards our claim in this suit, the same being done as avowed, " to hinder, delay and defeat," complainants', *creditors*, recovery under their judgment in a suit then pending. There is no dispute about the facts. Read the statement of Wilson under oath before the master, (page 19) where he directly admits " that the above acceptances were made in order to enable J. W. Brown to withdraw his share of the capital and profits of the firm of Wilson & Brown, he declaring it to be his intention, thereby, to prevent any one of his former creditors from getting an advantage over others, by means of any suit or execution and sale of his interest as above stated. And the suit of complainants then pending and about to be carried into judgment was one of the claims, as witness understood, moving the said Brown to the above course. The existence of this suit was known to witness at the time." See Brown's admissions in his answer and examination to the same purport.

Now if the payment of these drafts had followed their drawing, and had been consummated before the levy of our execution, this avowed purpose of both parties, by this scheme " to delay and defeat cred-

itors," would in equity render them liable to reclamation. But in the same statement Wilson further admits, that to that very day, the 20th April, 1848, more than two years after drawn, and more than one year after due—they were still unpaid. And up to that date he only knew the fate of one of them, or by whom held, and that a demand of payment of it by Taylor & Rich " had been made the fall before." " That for the others no demand had been made on witness. That they had been delivered when accepted, to Brown, defendant, and he (Wilson) cannot state from his own knowledge, how they were afterwards disposed of, or who held them at the time of the levy, or now holds them."

We hold this admission to be conclusive evidence to fix the charge of *fraud in law* upon these parties, and upon all whose rights they profess to represent *as agents*, and to invalidate and defeat this purposed appropriation of Brown's funds, with the express, avowed design and end " to prevent creditors from getting their debts by course of law." We assert without fear of contradiction, that not a case can be found either at law or in equity, when the purpose is avowed to be, to prevent, delay, or defeat creditors, that any assignment, transfer, appropriation or even payment, has been sustained against the claim of such creditors. And it matters not, whether such transfer, appropriation or payment, has been consummated or not, when such is the avowed or proved motive. Nor is it material in such a case whether a good and sufficient consideration has been paid.

The right of a debtor to give a preference, by a " *bona fide*" payment or transfer of effects, to any one creditor, when no bankrupt law intervenes to change the relations and rights of parties, is admitted. We admit also, the right of a purchaser acting " *bona fide*" to wrest from execution property, real or personal, before *lien* attached, and although vendor's motive or purpose may have been, " to delay, prevent or defeat creditors." But if " *mala fides*" enter into the purpose of both, the transaction is " fraudulent and void."

The most favorable position for Wilson, is to regard him as a *purchaser for a valuable consideration*, of Brown's share of the capital and stock in the firm. Yet we shall show that if he had paid the price, " a full consideration," yet purchasing with the avowed motive and object " to delay, prevent or defeat creditors," all the books characterize the transaction " as fraudulent and void."

HARVARD LAW SCHOOL LIBRARY.

But in point of fact, he had paid nothing—parted with nothing, but his *acceptances*, and they proved of so little account, that after more than two years, he had not heard of two of them, and knew not who held them.

In the meantime, Brown's share and stock remain in the firm, and Brown in the receipt of all the profits accruing to him before such acceptance. To this day, then, for aught that is known to this Court, the whole of Brown's money, stock and effects, may be still in the firm—while by this petty financial contrivance, our legal right to recover is prevented, delayed, and defeated. For authorities to sustain the above propositions, we refer to Twyne's case, found at large in 1 Smith's L. C., p. 1. The transaction comes clearly within the 2d, 3d, 4th and 5th points of that case, stated as indicating fraud. In Cadogan vs. Kennett, 2 Cowp., 432, Lord Mansfield said : " The only question in that case was as to the purpose and intention"—here they are avowed.

In Woolley vs. De Mattos, 1 Burrows, 474, 475, Lord Mansfield said : " Valid transactions as between the parties, may be fraudulent by reason of covin, collusion, or confederacy, to injure a third person," and he instances—" if a man, knowing that a creditor has obtained a judgment against his debtor, buy the defendant's goods for a full price, to enable him to defeat the creditor's execution, it is fraudulent," &c. The very case, as shown in this record, exhibits all these circumstances of " covin, collusion and confederacy, to injure complainants." This pretended purchase—*when no price has yet been paid*—when the day of payment is referred to the Greek Kalends—was made of defendant, Brown's, *goods*, to enable him to defeat a creditor."

See, also, Crane vs. Drake, 2d Vernon, Doe, demise of Willis, vs. Menton, 4 T. R., 39. This case from 4 T. R. goes to the effect that fraud will vitiate any transaction, " though the principal do not take any part in it, if his agent do—for the principal is civilly responsible for the acts of his agent." Now, under this last doctrine— if these pretended or real payees of these drafts were parties to or interested in this controversy, (which they are not,) their claims would be equally invalidated or postponed by the fraud of their agent, Brown. See Hovenden on Frauds, 2d vol., p. 222, and cases cited, for the principle.

While the contract or arrangement is executory merely—when (as in this case) no payment is made, or absolute assignment—the respective rights of the creditors are equitable merely, and the better equity must prevail. Beals vs. Guernsey, 8 John., 452, decides, "That the purchaser knowing of the judgment, must purchase with the view and purpose to defeat the creditor's execution, and if he does it with that purpose, it is iniquitous and fraudulent, notwithstanding he may give a full price. The question of fraud depends upon the motive. The purchase must be "*bona fide*" as well as on good consideration," &c. Refers to 7 Bur., 474. Cowp., 434.

Bridge vs. Eggleston, 14 Mass., 245. The law of this case is directly applicable. See opinion of Ch. J. Parker, 247. Damon vs. Bryant, 2 Pickering, 411. Adams vs. Page, 7 Pick., 542. Wadsworth vs. Havens, 3 Wend., 411. Reade vs. Livingston, 3 John., 481. Hooper vs. Hills, 9 Pick., 435.

To these *facts* and *authorities*, what reply has been made ? As to the *first*, it is contended, that under the original articles of agreement, Brown had a right to withdraw his capital when he saw fit, and to dissolve the partnership. We reply, that the course taken did not bring him within the terms of the stipulation of the articles. The act " of withdrawing capital" and " closing the concern," were to be concurrent acts. The concern was *not closed* on the 13th April, but kept afloat for another year. Neither was the capital in effect withdrawn. But if the acts had been concurrent and consummate, yet being incidents of and connected with a fraudulent purpose—an illegal design—the terms of the articles of copartnership could give no sanction to them. Wilson was under *no* legal obligation to aid in the scheme—he was a mere volunteer. How idle the pretext of withdrawing capital when nothing was in fact withdrawn ! No account taken to ascertain amounts—to fix balances—but a large conjectural amount, exceeding Brown's share—arbitrarily assumed ! While Brown, after this *simulated* withdrawal of all and more than his capital, is allowed by the new articles, to have the same share of profits as before. The artifice is too shallow to deceive. The articles exhibit B, of the 11th April, 1846, was a part of the fraudulent machinery designed to give color, and is entitled to no consideration.

But it is urged that this was the mere exercise of an acknowledged

right of a debtor to give a preference to one creditor over another.
And Mr. Archer contends that such conduct was highly meritorious
and honorable.   That the preferred debts stood in a higher grade of
merit than that of complainants'.    For this last assertion there is not
a tittle of reliable evidence.   " Preferences," such as the gentleman
speaks of, are *tolerated merely*—never approved of.   They are ad-
mitted as of necessity, in the absence of bankrupt laws.    But " pri-
ority" of debt—and next " equality," are the circumstances that gain
favor at law and in equity.   The principles invoked by the gentle-
man constitute the morals of the counting house and the stock bro-
ker's office—not of judicial tribunals.

In the beginning, I admitted this right as incontestible, but showed
it was subject to all the conditions of being " on good consideration,"
" *bona fide*," &c.   All the cases cited by me which prohibit con-
duct such as that of appellees, recognize the right of giving prefer-
ence—yet the argument of Mr. Archer would make it uncontrollable
and free from all limitation or restriction.   The only authorities cited
by Mr. Archer to sustain his case were, first Holbird vs. Anderson,
5 T. R., 235.   That case goes merely to establish the right of a
debtor to give a preference, when the transfer or assignment (by
judgment confessed) is consummate.   It may go to show that the
debtor's motive may be " to prevent or delay," but that unless both
parties concur in that illegal and fraudulent motive and purpose, the
design is not defeated.   In that case, the preferred creditor *did no*
more than agree to recover a just debt.   He was no *volunteer pur-
chaser to injure a third party*—to prevent or delay other creditors.
But the case of Hodgson vs. Newman, cited therein with approval,
goes to show a material distinction noted by Buller, Justice, which
renders the principal case no authority against us.

The other case cited, was Brooks vs. Marbury, 7 Wh., 566, which
does not the least resemble the present case.   The principles invol-
ved were altogether different.   There was no pretext that the deed
in that case was purposed or designed " to hinder, delay, or defeat
creditors."   In truth, it was an assignment for creditors generally,
with some preferences, but it was impeached on grounds of public
policy.   That the motive held out to grantor for making it was a
promise of indemnity from criminal prosecution—that it was made to
defeat the criminal justice of the country—to compromise a felony.

The rules of law applicable to it came under a different category from that in which the present case is found. It has no point in common with this. There, the transfer and assignment were perfected and consummate. Here, no title or possession in the stock or capital of the firm was changed, no goods or effects transferred—nothing in fact given or made over, but a mere alteration, and that colorable merely, of a balance on the books of the firm of Wilson & Brown.

The *fund* sought to be withdrawn by these drafts, did not at the time, nor for two years after, *go to pay any creditor*. But it is strongly urged in this case, that we cannot charge these defendants or either of them, without doing injustice to Hanson, Nason and other supposed creditors of Brown, for whom these drafts were made. This arises from a misapprehension as to the nature of our claim.

To establish that, it is not necessary for us to prove that these creditors have no right to recover on these acceptances. In candor and truth, we must say that we do not believe they ever expect or have any right to recover, except in the event that Wilson can safely pay them out of Brown's funds.

That seems to be the opinion of the master, after closely examining into the case, and all the attendant and following circumstances corroborate that conclusion. Be this as it may, if Wilson accepted or *ever paid*, in fraud of our rights as creditors, he accepted and paid in his own wrong, and cannot set up the act to our prejudice.

When our levy was made, nothing had been paid—nothing in fact assigned—nothing but a future liability assumed—voluntarily assumed. We knew not until answers made and proofs taken, who were these foreign creditors, or that such existed. Knew not of such claims. How then could we make them parties ? Why make them parties ? We seek not to defeat their claims, whatever they may be, against Brown & Wilson. We ask not the delivery of these drafts to us—we leave them to their remedies at law—looking to ours in equity.

The firm of Wilson & Brown, or " *quocunque alio nomine gaudet*" is not insolvent—we are not disputing about equitable assets, but if we were, the citation above from Hovenden, would prove that we have the better equity, for their claim only takes its rise from a fraud perpetrated to our prejudice by their agent, Brown. Then as re-

gards Wilson, if he *had paid full price*, consideration—according to
Lord Mansfield's doctrine in Cadogen & Kennett, & Woolley vs.
De Mattos, he would, notwithstanding, having acted " *mala fide*," and
have lost his money.

But Mr. Archer, in his written brief submitted, draws most libe-
rally from what he terms my admissions as to the correctness of the
master's report in general; and he thence deduces that I concur in
all that the master infers or conjectures as to the statements of Brown.

Now I do not adopt all the master's views touching this transac-
action. But even the master, favorably as he seems disposed to-
wards these parties, falls far short of the conclusions of Mr. Archer.
He gives the testimony with some favorable glosses, but concludes
nothing beyond verifying accounts, and reserves the effect of it for
the Court. Yet the learned and ingenious gentleman infers that I
admit that Taylor & Rich, Nason, Hanson, &c., were " *bona fide*"
creditors when these drafts were drawn, &c., and that the drafts
were in truth drawn in their favor, and went incontinently into their
possession. Now I admit no such thing—but believe and contend
the opposite from the very circumstances of the case.

It was not needful for me to contend that these drafts were held in
secret trust for Brown, or that the transaction was colorable merely.
The facts do warrant and give rise to strong suspicion that, as re-
gards part of them at least, such was the fact.

Now every business man must know that such utter neglect—such
oblivion manifested by *holders* of moneyed acceptances—such utter
indifference and ignorance on the part of acceptors as to their fate, is
most unprecedented in real business transactions. No man ever
heard of such a case before amongst merchants.

Years after due—two of them never heard of—not traced to any
holder by acceptor, the head of the house, the only responsible part-
ner—never presented for payment; and this, too, after passing into
the hands of defendant, Brown, the drawer, for whose accommoda-
tion they were accepted ! " *Credat Judeus appella, non ego.*"—
And yet the trivial circumstance is noted, that Wilson says he can-
not state these things " from his own knowledge." And what then ?
If these drafts had ever passed out of Brown's hands into the pos-
session of any "*bona fide*" holder and owner, must not, from the na-
ture of things, some application have been made for payment—some

inquiry at least made touching them, and to the acceptor, the head of the house, who, by the articles of co-partnership, managed the home business ?   The opposite supposition is inconceivable ;  and would not Wilson thus have acquired some knowledge of his own ?

It is not necessary for me to impute actual fraud—corrupt and impure motive and conduct, and I do not impute them ; but I do say that Brown's answer and testimony are not consistent, and do not establish that, at the time these acceptances were made, all these persons named were the actual creditors of Brown.

In the case of Taylor & Rich, there appears, *then*, to have been no actual indebtedness, but only an engagement or promise to create it, by future advances.   The proofs then, too, are that these drafts were drawn for conjectural amounts, without settlements or balances struck.

But the explanation made by the learned counsel, for this neglect, ignorance and oblivion touching these securities, is, that, while this suit of complainants was pending, Wilson was justified in withholding payment ; but this falls far short of explaining away the neglect and ignorance relating to the drafts—their ownership and possession—which Wilson acknowledges, though it may account for their not being paid.   Wilson could not *refuse* to pay before payment was asked—nor after refusal to pay, could he have no knowledge of who held them.   But the statement and explanation of the learned counsel goes to fortify and confirm the notion of the master, and the opinion I advance, that these drafts were never designed to subject Wilson to any absolute liability—that they imposed upon him no unconditional obligation to pay their amounts.   If this be so, then there is an end of all pretext for regarding this as an absolute purchase or withdrawal of Brown's share of the capital, by payment, or equivalent debt created on Wilson's part. ˙ Nothing was paid, and nothing is likely to be paid by him, in consequence of our recovery, beyond the amount we may recover.   If he can be permitted thus far to stave off all claim on these drafts, he can continue to do so.

In conclusion, I would respectfully suggest to the Court, the vital importance of preserving in their full force the salutary principles of our statute of fraud, borrowed from those of Elizabeth.   While the Court may keep open and unfettered the ready transmission of property and effects, when directly, absolutely and openly assigned—

32

while they, in the absence of a bankrupt law, may allow these strug-
gles amongst creditors for preferences on "*bona fide*" debts, they
should watch with jealousy these secret attempts to withdraw prop-
erty from its legitimate liabilities—more especially should a Court of
Equity guard its process from contempt.

In vain do Courts of Justice hold out to suitors redress in their
Courts, if, after protracted and expensive litigation, when they are
in position to reap the fruits of their actions, parties may, with pur-
pose avowed to delay or defeat their remedies, combine, under color
of giving preference to A, to divest B. of his legal rights. This no-
tion of giving preferences is already too prevalent, and its practice
regulated by caprice and partiality, and fraught with much injus-
tice. It requires restraint rather than encouragement—for while it
is obnoxious to abuse even amongst the honorable class of merchants,
it prevails to a most vicious extent amongst stock-jobbers and specu-
lators, and every class of gamblers, under the specious pretext of
preferring " debts of honor."

*J. T. Archer*, for appellees :

The orginal articles of partnership between Wilson & Brown,
which are exhibited, bear date 12th January, 1844. They contain
a provision that " the concern shall be dissolved, and each of the
partners draw his proportion of the capital thereof, whenever either
of said parties shall wish to close the concern."

By reference to the cause of action on which Gassett's judgment
is founded, it will be found that M. C. & J. W. Brown were *in ar-
rears* at the date of the partnership between Wilson & J. W.
Brown. This circumstance verifies the allegation of Brown, that
he was involved when he commenced with Wilson. There could
be no other object on the part of Brown than to add to his resources,
to enable him to retrieve his losses ; and the circumstance of his con-
nection with Wilson, though embarrassed himself, being avowed to
the world, is proof against any fraud contemplated by such a co-part-
nership.

There was also propriety in this case in retaining to himself the
*right* to withdraw his capital at any moment. He was in business
under the indulgence of his creditors, and if any sought to press, as
did the Gassetts, while the others remained indulgent, it would be

inequitable to permit the pressing creditor to gain an advantage, by obtaining *legal priorities.* To prevent the unjust appropriation of all his means to one *exacting* creditor, to the total exclusion of all other claims of a confidential nature and otherwise, was not only not inequitable, but his duty. Consequently, he reserved the right to control his capital—to withdraw it from the concern of Wilson & Brown, and to apply it to the payment of his creditors, according to his own sense of duty and justice. This privilege he exercised—was compelled by duty to exercise, when he found the Gassetts, in the face of indulgence on the part of all others, seeking by suit to subject all his means exclusively to themselves. The claim of Taylor & Rich was for moneys advanced, and, according to the understanding of merchants, entitled to the position of a confidential claim, and as such entitled, by all just rules prevailing among merchants, to a priority over the claim of complainants. So, likewise, were the other claims preferred by defendant, Brown. He, therefore, preferred these to the claims of Gassett, and other claims against the old firm of M. C. & J. W. Brown. He drew upon the firm for his interest, procured their acceptances negotiable, and transferred the accepted drafts, to his preferred creditors. Was this a fraud in fact or law ? See 2 Kent's Com., 532, and note.

Suppose on the 13th April, 1846, Brown had assigned his interest in the firm of Wilson & Brown by a voluntary deed of assignment, preferring certain creditors, to the exclusion of Gassett & Co., would this have been a fraud ? Is there one assignment in a hundred made by insolvent debtors, even pending suits, that does not give preferences ? Is there any thing unusual, unlawful, or fraudulent, in giving preferences in assignments ? Do not all merchants recognize as essential to the business of merchants, that there may be confidential debts, and that the debtor has a right to discriminate ? On this point, if it be necessary to cite authorities, see Harrison vs. Trustees Phillips Academy, 12 Mass., 456. Hatch vs. Smith, 5 Man., 42. Widgery vs. Haskell, 5 Man., 144. Marbury vs. Brooks, 7 Wheat., 566 ; also, 2 Kent, 532, before cited. Wilkes vs. Ferris, 5 Johns., 335. Phœnix vs. Ingraham, 5 Johns., 412.

What are all the drafts delivered to Taylor & Rich, to Nason and to Hanson, but assignments *pro tanto* of his (Brown's) interest—a withdrawal and appropriation of his means, for the purpose of provi-

ding for the claims of Taylor & Rich and others, in preference to Gassett ?

Such an assignment is not fraudulent, when the creditor actually pays or secures a *bona fide* debt due by him. A sale by an insolvent debtor of his property, to convert it into money, to prevent his creditors from reaching it, and to enjoy it himself, is a fraud ; and if the purchaser knows his motives, he is involved in the fraud. But a sale or assignment to pay a just debt, in preference to the claim of a suing creditor, is not unlawful. In such case, the debtor *appropriates* his means to his creditor, and this is no fraud, though the suing creditor be disappointed. Had Brown withdrawn his capital, not to pay debts, but to conceal his means in his pockets, and beyond the reach of his creditors, it would have been a fraud—his motives being iniquitous would have established the fraud. But to withdraw his capital, for the purpose of paying *bona fide* creditors, is not a fraudulent purpose. The authorities cited by complainant's counsel do not, therefore, apply—as it does not appear that Brown withdrew his interest to conceal it from his own creditors, with a view to his own benefit ; but, on the contrary, that he appropriated it for the purpose of securing the payment of just and *bona fide* debts, before the judgment of complainants was obtained against him. See Holbird vs. Anderson, 5 T. R., 235. Estwick vs. Caillaud, ib., 424.

How can Henry Gassett & Co. ask the appropriation of all Brown's means to their claim, to the exclusion of all others, and then say that a like appropriation by Brown to any other equally just claim is a fraud ? How can they or their counsel denounce Brown for doing for certain creditors what they are seeking to do for themselves ?

As before alleged, the claims preferred by Brown were of a confidential nature. Independent of this, there are circumstances which place the conduct of Brown in the most unexceptionable point of view. From the testimony, it is clearly deducible that the firm of M. C. & J. W. Brown had failed—that, notwithstanding this failure, and the consequent embarrassment of defendant, Brown, he commenced business without concealment of his interest in the firm of Brown & Nason, and afterwards of Wilson & Brown. It also appears that Brown & Nason were liable under outstanding, unsettled demands against the firm. The credit obtained by J. W. Brown du-

ring his insolvency must, necessarily, have been from a confidence, not in his solvency, but in his sense of justice. Unquestionably, the debts to which he occupied such a position were eminently entitled to be classed as confidential. It was particularly his duty to see his more recent debts paid, rather than suffer the means he had acquired from such creditors to be appropriated to the liabilities of M. C. & J. W. Brown. In other words, the creditors of M. C. & J. W. Brown could not equitably claim of J. W. Brown any assets arising from the business of Brown & Nason, until the creditors of Brown & Nason were satisfied, and a settlement was had between the partners themselves.

But under any circumstances, Wilson could not have refused his assent to the withdrawal of Brown's capital—for he was bound by his articles of co-partnership to consent to a dissolution of the concern, whenever it was demanded by Brown ; and a refusal to accept drafts for that purpose, would have rendered him liable in damages to Brown in an action at law. It was no fraud in him, but his legal duty to fulfil his contract with Brown. The relation between them was analogous to that of debtor and creditor ; and no debtor has a right to refuse payment to a creditor, on the ground that the latter is suspected of an intention to make an inequitable disposition of his means, even if there were just grounds for such apprehensions. How can Wilson be chargeable with " *mala fides*" in complying with his agreement, when a refusal to do so would have been a breach of faith, and a violation of his contract ?

The non-presentment of the drafts, which is relied on by complainant's counsel as ground to suspect fraud, is a matter which does not affect the merits of the defence, and which the defendants cannot be called upon to explain. The pendency of this very suit affords a reasonable conjecture as to the reason of the non-presentment of these drafts, and the complainants have not taken the proper steps for ascertaining the reason with any greater certainty than is afforded by conjecture. The cause of the delay could have been known, had the preferred creditors been made parties to the bill of complaint ; and the complainants having omitted to make them parties, it certainly should not avail them to attempt to throw suspicion upon the transaction, on the ground that some of the circumstances connected therewith are not explained. It would be making the

defendants suffer the penalty of the complainant's omissions—permitting the complainants to take advantage of their own neglect. The holders of the drafts should have been made parties on other grounds. The Court cannot render a decree against Wilson for the amount of Brown's former interest, while these acceptances are outstanding against him. Should a decree be rendered against Wilson, the same decree should order these drafts to be delivered up for cancellation; otherwise, Wilson would be subjected to pay the same demand twice, which would be inequitable and unjust, but could not be avoided, should a decree be rendered against him, while the holders of the drafts are not before the Court.

I will only add to the foregoing, that complainants' counsel opens his argument by an avowal, " in limine," that he takes no exceptions to the master's reports on the facts he professed to decide. These facts proved are simply that Taylor & Rich, Nason and Hanson, were bona fide creditors of Brown, and Brown & Nason; that his (Brown's) interest in the firm of Wilson & Brown was drawn for, in favor of these parties, prior to Gassett's judgments.

If these are the conceded facts, the only question arising is one of law :—Whether the drafts accepted take the fund, or the execution ? and this involves the settlement of the rights of parties not before the Courts.

Unable, however, to sustain his case by authority, after this concession " in limine," the counsel for complainants is compelled, in order to bring his case within the authorities cited by him, to gainsay his avowal at the outset, by contending that the drafts were not drawn to give preferences to bona fide creditors, but are virtually held in secret trust for himself. The delivery to bona fide creditors is proved. There is no proof of a secret trust. That is not to be presumed ; it must be proved by complainant.

The evidence relied on to establish a secret trust is the non-payment of the drafts. Wilson says he does not know of his own knowledge who held two of the drafts—Brown is not interrogated as to the reasons why the drafts have not been presented, or paid—the holders are not parties to answer for themselves. The bill is one of discovery, and the defendants are witnesses of complainants. Brown could only answer as interrogated by complainants, or cross-examined on same subjects—he was not asked why the drafts were not presented, or paid.

JANUARY TERM, 1850.                    25⁇

Henry Gassett & Co. vs. Wilson & Brown.—Opinion of Court.

DOUGLAS, Ch. J.

This cause came on for final hearing in the Court below, and was argued by counsel : whereupon it was ordered, adjudged and decreed, that the bill be dismissed, and that the complainants pay the costs, &c.

The case has been ably argued in this Court, and the question presented for our consideration, is, whether the Court erred in making that decree.   On behalf of the complainants it has been contended in an argument that evinces great labor and research, that the transaction between Joseph W. Brown and Wilson & Brown, was a sale made by said Brown, of his interest in the partnership, to Wilson, for the purpose and intent to delay, hinder and defraud his creditors, and especially the complainants, and is therefore entirely null and void according to the provisions of the statute of 13 Eliz., chap. 5, and our statute in relation to fraudulent conveyances, Thomson's Digest, page 215, which is almost identical in its provisions with that of 13 Eliz. on that subject.   On the other hand, it has been argued with equal zeal and ability, that the transaction was entered into solely for the purpose of giving a preference to certain creditors over others, which Brown had the right (and under the circumstances) it was his duty to do, that Brown had suffered great losses before, and was consequently involved when he commenced business with Wilson—and that there could be no other object on the part of Brown than to add to his resources, to enable him to retrieve his losses—and the circumstance of his connection with Wilson (though embarrassed himself,) being avowed to the world, is proof against any fraud contemplated by such a partnership.   That there was also a propriety in this case, in retaining to himself the right to withdraw his capital at any moment. · He was in business under the indulgence of his creditors, and if any sought to press, as did complainants, while the others remained indulgent, it would be inequitable to permit the pressing creditor to gain an advantage by obtaining legal priorities. Let us see if this will bear the test of scrutiny.

The defendant, J. W. Brown, had been engaged in mercantile business, as a member of the firm of M. C. & J. W. Brown, previous to the fall of 1843, at Cedar Keys and Port Leon.   In 1842, a gale of wind at Cedar Keys destroyed a portion of their effects, and in the month of September, 1843, another storm not only swept away the residue of their property, but all their books and evidences of

debts due them, except one day book so much obliterated as to be of little or no value, and left them almost entirely destitute ; and it is a part of the history of the country, that it swept away Port Leon itself and left it a desolation.   During the period of their prosperity they had become indebted to twelve northern houses, as appears by the record, of whom the complainants are one, all of whom, prompted by that feeling of benevolence and humanity which is always characteristic of a highminded and honorable merchant, or from some other cause, agreed to renew all the notes of the firm of M. C. & J. W. Brown at the rate of fifty cents on the dollar, to be paid in three equal instalments, six, nine, and twelve months from date, with interest after six months—this agreement bearing date the 2d of September, 1844.   What the amount of the whole indebtedness was, does not appear—if, however, the other debts respectively, bore any proportion to the one here claimed, it must have been near $30,000, and if it were one third of that sum, no reasonable man could have expected it to be be paid by M. C. & J. W. Brown, out of any business in which they might engage, situated as they were, within the time stipulated ; and it seems not to have been expected by the other creditors, or considered within the spirit and meaning of the compromise, by the defendant, Brown, for he says in his answer (speaking of the old creditors) that these assurances (of indulgence) have been sacredly kept by all, save the complainants.

The judgment of complainants was obtained on the 20th May, 1846.   The suit must have been commenced immediately after the last payment under said agreement fell due.   There is no evidence that the embarrassments of J. W. Brown were concealed ; it is alleged and not denied, that they were well known—it is not to be supposed that Wilson intended to involve himself in them, or that Brown could have obtained credit that would have enabled him to have carried on his business, except upon the assurance to (or at least the expectation on the part of) the new creditors, that they should be paid out of the avails of the goods they sold him.   Was there any moral wrong under these circumstances, in his taking means to prevent the appropriation of all his means to these exacting creditors, to the total exclusion of all others, old and new ?   We think not, and are happy to find, upon reference to the brief of the learned counsel who argued this cause for complainants, that he does not

impute to these defendants actual fraud, or corrupt motives or conduct. He insists most strongly, however, that the transaction is a fraud in law. But in what does the fraud consist ? Surely not in the payment of *bona fide* and honest debts. It is said, moreover, that the acceptances of Wilson & Brown, were made to enable J. W. Brown to withdraw his share of the capital and profits of that firm, he declaring it to be his intention thereby to prevent any of his former creditors from getting an advantage over others by means of any suit, or execution and sale of his interest as above stated ; and that the suit of the complainants, then pending and about to be carried into judgment, was one of the claims moving said Brown to the above course. And from this it is argued that fraud must be inferred, and that if payment of these drafts had followed their drawing, and had been consummated before the levy of complainants' execution, this avowed purpose by both parties "to delay and defeat" creditors, would in equity render them liable to reclamation. Without pausing to inquire how far this proposition may have been true, had these drafts been handed over to a person or persons standing in a new relationship to the said J. W. Brown, or indeed to any one else without any valuable consideration, it is sufficient to say that it appears by the proofs (and so the master has reported) that they were passed over to three creditors of said Brown, and intended as part payment of debts, fairly and justly due by him, and that these creditors were among those from whom he had made, or who aided him in making, his late purchases, or in paying therefor.

Again it has been urged that the holders of these drafts have not called for payment, and that a secret trust for the benefit of Brown must therefore be presumed ; but this does not follow. They may abstain from feelings of kindness towards Brown, or from motives of policy, he being a customer, and we do not see that the complainants have any cause to complain because other creditors are not as exacting as themselves. It would work no injury to them, were payment never to be demanded. This transaction has been treated by the learned counsel for the complainants as a sale by Brown of his interest in the partnership to Wilson, but it was not so ; it was a withdrawal of it under the original articles of partnership. After this withdrawal, he had no interest in the firm, until the new articles were made ; and it was withdrawn for the purpose of giving prefer-

33

ence to the creditors to whom the drafts were passed over, which the defendant, Brown, might lawfully do.

In the case of Holsey, et al. vs. Whitney, et al., 4 Mason's C. C. R., 206, (which was a contest between an attaching creditor and a trustee under a general assignment for the benefit of all creditors,) Judge Story held that a general assignment is good, notwithstanding it does not purpose to convey all the debtor's property, and yet requires a general release ; or does not fully enumerate all the debts due, or describes the property generally, or gives a preference to certain classes of creditors. A general assignment, said Lord Ellenborough, in Peckstock vs. Lyster, 3 Maule & Sel., 371, is to be referred to, as an act of duty and not of fraud, when no purpose of fraud is proved, and Justice Le Blanck added in the same case, " to hold such a deed fraudulent, would be contrary to Holbird vs. Anderson, 5 T. R., 325, and to all the cases which have decided that a party independent of the bankrupt laws, may convey away his property for the benefit of all his creditors." Justice Bailey gave full assent to the doctrine, emphatically observing " that this conveyance, so far from being fraudulent, was the most honest act the party could do." This doctrine was asserted in a case where the very object of the conveyance was to prevent a judgment creditor from obtaining satisfaction out of the property on execution." But the Court decided that it was not sufficient that the creditor was delayed and defeated by such a conveyance of his remedy under the execution ; but the act must be fraudulent. Nor (said Judge Story, in Holsey, et al., vs. Whitney, et al., above cited) was there anything new in this doctrine. " It may be clearly gathered from prior cases, and especially from Estwick vs. Caillaud, 5 T. R., 420, Holbird vs. Anderson, 5 T. R., 235, Minx vs. Howell, 4 East. R., 528, and has since been confirmed even as against the crown in the King vs. Watson, 3 Price, Ex. Rep., 6. 1 Cond. Eng. Ex. R., 265 to 271.

" It would indeed," says Judge Story, " be somewhat strange if a debtor might *bona fide* prefer one creditor to another in the distribution of his property, and was not at liberty to prefer all his creditors to one,"—Ibid, 211. " The law allows the debtor to give a preference to one creditor (and I think to all creditors also) by a *bona fide* conveyance." Ibid, 213. In Estwick vs. Caillaud, 5 T. R., 278, it was held that " if a person having several creditors, convey by

deed the legal interest in part of his real and personal property to a trustee in trust (after deducting expenses respecting the trust) out of the rents and profits, to pay half the surplus to the grantor for his own use, and the residue among certain creditors named in the schedule, such deed was valid." Lord Kenyon said there was nothing fraudulent either in the construction of the deed or the manner of carrying it into execution. It was neither illegal nor immoral to prefer one set of creditors to another. Ashurst said there is nothing illegal on the face of the deed, for there is no objection to a debtor's preferring one set of creditors to another. Ibid, 221. Indeed the right of a debtor to give a preference by a *bona fide* payment or transfer of effects to any one creditor, when no bankrupt law intervenes to change the relations and rights of the parties, was admitted by the learned counsel for the complainants in the argument, and he attempted to show that the transaction in this case was *mala fides*, relying in proof of that position, upon the statements of the defendants, that it was intended to prevent the complainants from obtaining a priority by their execution. But the case of Peckstock vs. Lyster, 3 M. & S., above cited by Judge Story in Holsey, et al., vs. Whitney, et al., 4 Mason, 211, is an authority against that position, and so is Holberd vs. Anderson, 5 T. R., 235. In the last case, the facts are as follows: In Easter Term, 1791, Shepherd obtained a judgment against Charter, who brought a writ of error and delayed execution until Easter Term, 1792, when judgment was affirmed in Exchequer Chamber. On the 7th of May, the costs in that suit were taxed, and on the 8th of May, Charter, knowing Shepherd's intention to take out execution which he was entitled to sue out on that day, went to the plaintiff, Holbird, who was a creditor of his, informed him of his situation, and executed a warrant of attorney to confess a judgment, on which, judgment was immediately entered up and execution sued out, and delivered to the sheriff two hours before Shepherd's execution reached sheriff's office. The sheriff levied under Shepherd's writ and returned *nulla bona* to the plaintiff's. On this evidence it was contended on the part of the defendants, that the plaintiff was not entitled to recover, inasmuch as this was an undue preference given by Charter to the plaintiff for the purpose of defeating Shepherd's execution, and that the warrant of attorney given to plaintiff was fraudulent and void by the statute 13 E., C. 5. But Lord Kenyon being of opinion that there was no undue

preference, the plaintiff had a verdict, to set which aside, Gibbs obtained a rule to show cause, which was fully argued ; when Lord Kenyon, Ch. J., said " there was no fraud in this case—the plaintiff was preferred by his debtor, Charter, not with a view of any benefit to the latter, but merely to secure the payment of a just debt to the former, in which I see no illegality or injustice. The words of the statute, 13 Eliz., do not apply to this case, for the warrant of attorney was given on good consideration, and the other words in the act " bona fide," only apply to those cases where possession is not delivered or is only colorable ; of the former kind, was Twyne's case, where the vendor continued in possession, and of the latter, Hodgson vs. Newman, where (as far as I recollect) the goods were removed from the vendor's houses and his wife continued in possession of them." Ashurst, J., and Buller, J., concurred, and the rule was discharged. We have cited this case very much at length, because it is a leading one, and identical in principle with the case at bar. And the doctrine contained in it is fully sustained by the opinion of the Supreme Court pronounced by Ch. Justice Marshal in the case of Marbury vs. Brooks, 7 Wheat. Rep., 556, 5 Peters Cond. Rep., 356, in which that Court says " that a debtor has a right to prefer one creditor to another cannot be denied, and that his private motives for giving this preference, provided the creditor has done nothing improper, cannot annul this right, is equally certain. On the other hand it will also be admitted, that any unlawful consideration moving from the preferred creditor, to induce this preference, may avoid the deed which gives it." There is no evidence in the case before us, of any such unlawful consideration moving from the creditors, to whom the drafts above mentioned were transferred, to induce the preference given.

The case of Brooks vs. Marbury came again before the Supreme Court in 11 Wheat., 78. 6 Peters' Condensed Reports, 223 to 236. Chief Justice Marshal again pronounced the opinion, and at page 227 said : " The preference of creditors of a particular description over others, being one which a debtor has a right to make, the sale of his property, and the payment of the proceeds to such favored creditors, being an act which the debtor may perform by himself, or his agent, we cannot conceive that the motives which may have induced the preference, although communicated to the agent, can in reason affect

the transaction, provided nothing has occurred on the part of the creditors, which is in any degree exceptionable, either in law or justice." Nothing exceptionable appears on the part of the creditors here—nothing complained of, only that they have not pressed their claims on Wilson & Brown for the payment of the drafts, which works no injury to the complainants, and may have resulted from the cause suggested by the master, who says " the delay of payment appears to have been in consequence of the failure on the part of defendant, Wilson, to realize and collect a large sum of the accounts then (on the 31st July, 1846,) due, and supposed to be good, but which have since proved to be on parties in failing circumstances, or wholly insolvent."

Now, while it is not denied that valid transactions between the parties may be fraudulent, by reason of the covin, collusion, or confederacy, to injure a third person, as held in Woolley vs. De Mattos, 1 Burrows, 474, where " if a man, knowing that a creditor has obtained judgment against his debtor, buy the defendant's goods for a full price, to enable him to defeat the creditor's execution, it is fraudulent," is instanced as cited by the solicitor for the complainants ; and that fraud will vitiate any transaction, " though the principal do not take any part in it, if his agent do, because the principal is civilly responsible for the acts of his agent," as was held in Doe ex. dem., Willis vs. Martin, 4 Term Rep., 39, also cited, we do not perceive that the principles there asserted touch this case. In the first, the purchaser was an indifferent person, not a creditor purchasing with a view to secure the payment of a fair and *bona fide* debt ; and the latter does not seem to be applicable, unless we are to consider Wilson the agent of the holder of these bills, and engaged in a fraudulent transaction. But we do not look upon him as their agent—he was the partner of Brown, associated with him under articles, by one of which, Brown had a right, at any time, to withdraw his portion of the capital invested. The complainants are pressing Brown ; he prefers others, whose claims are equally meritorious, and who, indeed, have stronger claims to these funds, from the fact that they had aided him to raise them ; he draws for the amount of his portion of his capital stock to pay them. What right had Wilson to say aught against it ? The law does not forbid it—the soundest principles of morality justify it. Wilson, if he could be consid-

ered in the light of an agent in this matter, was only aiding his principal to secure the payment of just and honest claims. Upon a full review of the whole case, therefore, we perceive no error in the decree of the Court below, and it is, therefore, affirmed.

*Per totam curiam.*